# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| CHRISTOPHER HESTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:16-cv-1899-JEO |
| | ) | |
| UNIVERSITY OF ALABAMA | ) | |
| BIRMINGHAM HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Christopher Hester filed a complaint in this court[1] alleging he was terminated because of his race in violation of Title VII of the Civil Rights Act of 1964.  (Doc. 1). [2]  The court has before it the June 29, 2018 motion for summary judgment filed by Defendant The University of Alabama Board of Trustees ("UAB").[3]  (Doc. 26).  The motion has been fully briefed (docs. 27, 33, 38), and is now ripe for decision.  For the reasons set forth below, the motion is due to be granted.

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 18).

[2] All evidentiary citations refer to the document and page number provided by CM/ECF, the court's electronic document filing system, except for citations to depositions, which refer to the page number provided on the deposition transcript, and affidavits, which refer to the paragraph number in the affidavit.

[3] The answer states the Defendant was incorrectly named as University of Alabama Birmingham Hospital in the complaint.  (Doc. 5 at 1).

# I.    STATEMENT OF FACTS[4]

Plaintiff Christopher Hester, an African-American, began his employment with UAB on March 3, 2011, as a patient observer. (Doc. 28-1 ("Hester Dep.") at 31). In December of 2013, Hester applied for a Patient Care Technician ("PCT") position and was accepted. (*Id*. at 36). He was transferred to the Jefferson Tower North 5 (JTN5) unit of the Center for Psychiatric Medicine (CPM) on March 22, 2015. (*Id*. at 38.) The JTN5 unit serves as an inpatient unit for psychiatric patients committed by a probate court. (Doc. 28-3 ("Hand Dep.") at 7). Employees working in the unit provide long-term care to patients suffering from psychiatric disorders making them a danger to either themselves or the public. (*Id*. at 53-54).

PCTs are trained in venipuncture, vital signs monitoring, and blood sugar monitoring. (*Id*. at 12). As a PCT, Hester reported to the Assistant Nurse Manager in CPM on the JTN5 Unit, Daniel Nash. (Doc. 28-9 ("Nash Dep.") at 8, 13). Nash reported directly to the Nurse Manager in CPM on the JTN5 Unit, Wren Hand. (*Id*. at 11; Hand Dep. at 9). Hand reported directly to the Administrative Director of Nursing over the CPM, Steve Nasiatka. (Doc. 28-5 ("Nasiatka Dep.") at 12, 29; Hand Dep. at 11). The Administrative Director of Nursing is the highest ranking employee at the CPM facility.

---

[4] These are the facts for purposes of summary judgment only. This case involves video evidence. District courts review video evidence *de novo* and when a video recording blatantly contradicts a party's testimony, the testimony is rejected on summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010); *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1290 n.3 (11th Cir. 2009).

All employees working at UAB must follow certain guidelines and procedures found in the UAB Code of Conduct and UAB Employee Behavior Policy. (Doc. 28-7 ("Mayer Dep.") at 14). In addition, all CPM employees must complete and operate using the Crisis Prevention Institute (CPI) training. (*Id*.). The CPI training program focuses on "safe management of disruptive and assaultive behavior." (Doc. 28-2 at 105). UAB uses the CPI training to maintain safety for patients and employees that operate within CPM. (Hand Dep. at 18-19). The CPI training teaches employees the escalation model of patient behavior which includes identifying early warning of behavior escalation and how to protect themselves and other patients from a patient whose combative behavior has escalated. (Nash Dep. at 19-20). CPM employees initially receive 8 hours of CPI training in the same month they are hired and then receive 4 hours of recertification training in addition to CPI drills. (Hand Dep at 20-23). After an employee has successfully completed CPI training, the employee is issued a CPI Blue Card to signify completion of the training. (Doc. 28-2). Dealing with particularly difficult patients does not alleviate the burden on UAB employees from adhering to the CPI training and following other UAB policies and procedures. (Hand Dep. at 31). Hester received CPI training and his CPI Blue Card in December of 2011, and attended a refresher course on March 26, 2015. (Hester Dep. at 35, 38-39).

UAB utilizes a progressive discipline policy for a large number of deficiencies and offenses. (Doc. 28-8 at 2). In other words, in the absence of an act warranting immediate termination, discipline normally begins at a lower level and increases with each additional disciplinary action. (*Id.*). However, the Employee Behavior policy enumerates a number of offenses that can lead to immediate termination without notice. (*Id.*). These offenses include "incompetence in patient care" and "dishonesty." (*Id.*). Further, the UAB Code of Conduct proscribes the "fabricat[ion] of information" and "misrepresent[ation] of events." (*Id*. at 4). In addition, it requires that UAB employees "provide the highest quality of care by reaching for excellence." (*Id.*).

### A. October 27, 2015 Incident

On the morning of October 27, 2015, in exercise of his work responsibilities, Hester woke patient C.L. from his sleep and told him that breakfast was ready. (Hester Dep at 105). Hester then took a seat in a chair placed on the JTN5 floor in the same common area where C.L. awaited breakfast. (Doc. 28-13 ("Incident Video"); Nasiatka Dep. at 23). Before breakfast, C.L. refused to allow his vitals to be taken and refused to ingest his prescribed medication. (Hester Dep. at 56). As a result and in accordance with hospital policy, C.L.'s breakfast was delayed until C.L decided to cooperate. (*Id*. at 55-56). C.L. became agitated when he had not received his breakfast and began to speak to himself and to the hospital staff using

violent and manic language. (*Id*. at 56-57). He paced the JNT5 floor occasionally speaking with Hester and other members of the staff. (*Id*. at 122; Incident Video). He demanded that Hester provide breakfast. (*Id*.). When Hester refused to provide breakfast, C.L. slowly approached Hester while addressing him verbally. (Incident Video). Throughout the entire approach, the C.L.'s hands were at his side. (*Id*.). As C.L. drew close, Hester quickly rose from his chair with his hands extended in front of his body and wrestled the patient to the ground. (*Id*.). After a brief period of wrestling on the floor, another hospital employee ended the encounter. (*Id*.). The entire event lasted only a few seconds. (*Id*.).

## B. Investigation and Termination

Shortly after the altercation, the Human Resources Department initiated a review of the incident. (*See* Doc. 28-23 at 2). As part of that investigation, Hester completed a written statement relating his version of the events. (Doc. 28-2 at 125-26). In the statement, Hester asserted that he was attacked by C.L. (*Id*. at 125). Specifically, Hester stated:

> [C.L.] became combative and started threatening staff. My staff members and I remained calm and stated quiet until [C.L.] could calm down; then [C.L.] turned to me, and asked could he have his tray. I remained calm, and said to him I didn't want to engage in a power struggle, with my head slightly down. I didn't want to make eye contact while [C.L.] was upset, and that's when he attacked me, and hit me with a closed fist while I was sitting down. I stood up as I was getting hit to descalate [sic] the situation I was in, and tried to hold [C.L.'s] left arm so I could inform CPI than [C.L.] and I legs got

tangled.  We fell to the floor and as we were falling [C.L.] took his arm and put it around my neck . . . .

(*Id*. at 125-26).

Hester was terminated on November 10, 2015.  (Doc. 28-18 at 3).  The stated reasons for his termination include a "violation of You and UAB 7.3.1 'Inappropriate behavior toward, or discourteous treatment of, patients,'" as well as not following the core value "Do Right."  (*Id*.).  The counseling record specifically stated Hester "went beyond what is appropriate becoming involved in an altercation with the patient rather than utilizing CPI techniques," the "physical altercation . . . was not part of CPI training for safely managing a patient's physical aggression," and his action posed a risk to the patient's safety.  (*Id*.).  Additionally, the counseling record noted that Hester's written statement did not accurately reflect the incident.  (*Id*.).

Nasiatka maintained the final responsibility for the termination decision; however, Kelly Mayer and Greg Erwin[5] from Human Resources were in agreement as to the decision to terminate Hester.  (Nasiatka Dep. at 16-17, 23; Mayer Dep. at 27-28; Doc. 28-10 ("Erwin Decl.") ¶ 21).  The decision was based on their review of the video footage and their resulting conclusion that Hester had failed to adhere to UAB policies and his CPI training. (Nasiatka Dep. at 17).  Specifically, the

---

[5] Kelly Mayer was the Manager of Employee Relations and Greg Erwin was a human resources consultant with UAB at all relevant times. (Mayer Dep. at 9, 11).

reviewers found Hester failed to stand up and distance himself from the approaching patient, and he did not take supportive stance, use interim control position, block and move, or run away. (Nasiatka Dep. at 18, 32; Nash Dep. at 28; Doc. 28-23 at 13). Nasiatka believed that Hester's actions placed C.L., and other people in the common area at risk. (Nasiatka Dep. at 34). In addition, Erwin testified the inconsistency between the video evidence and Hester's written statement was another independent ground for termination because dishonesty is prohibited by UAB handbook policies. (Erwin Decl. ¶ 24).

Neither Nash nor Hand participated in the ultimate termination decision, although they played a role in the investigation. (Nash Dep. at 19-23, 28; Hand Dep. at 88). In fact, Nasiatka testified he overruled Hand's recommendation not to terminate Plaintiff,[6] but instead to issue a written warning and provide additional education. (Nasiatka Dep. at 16; Doc. 28-6 at 2).

### C. EEOC Charge and Notice of Right to Sue

Hester filed an EEOC charge on March 31, 2016, alleging discrimination on the basis of his race. (Doc. 28-20 at 7). On August 30, 2016, the EEOC dismissed the charge and issued Hester a Notice of Rights to sue. (*Id*. at 5-6). Hester timely filed his complaint on November 28, 2016. (Doc. 1).

---

[6] Initially, Hand was not in favor of terminating Hester's employment even though she agreed Hester had failed to use CPI training measures during the altercation. (Doc. 28-23 at 19.) However, upon conducting a frame-by-frame analysis of the video of the encounter, she supported the termination. (Hand Dep. at 90).

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleading depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id* at 323.  Once the movant has met its initial burden, the non-moving party must go beyond the pleading and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue suitable for trial. *See id.* at 324; *see also* Fed. R. Civ. Pro. 56(e).

Substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences must be resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248. If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

## III. DISCUSSION

Plaintiff's complaint consists of a single count: race discrimination in violation of Title VII of the Civil Rights Act of 1964. (Doc. 1 at 1). Defendant contends summary judgment is proper because Hester has failed to establish a prima facie case of race discrimination because he cannot identify a similarly-situated comparator. (Doc. 27 at 10-18). Even if he could establish a prima facie case, Defendant contends summary judgment is proper because Hester was terminated for legitimate, nondiscriminatory reasons and there is no evidence of pretext. (*Id*. at 18-29). For the reasons stated below, the court concludes that there are no material issues of fact in this case and Defendant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56.

Analysis of a Title VII disparate treatment claim based on circumstantial evidence as the one presented here requires the application of the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). Under this framework, a plaintiff must establish a prima facie case of disparate treatment by showing: (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated employees outside

his class more favorably; and (4) he was qualified to do the job. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). After the plaintiff meets this initial burden, the employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Wilson*, 376 F.3d at 1087. This burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993), and has been characterized as "exceedingly light." *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983). As long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). After an employer articulates one or more legitimate, non-discriminatory reasons for the employment action, the plaintiff must show the proffered reason was a pretext for illegal discrimination. *Id.* If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot simply recast the reason but must "meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

The court is mindful that the Eleventh Circuit has clarified that the framework is not the only way for the plaintiff to survive summary judgment in a discrimination case. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, the plaintiff can survive summary judgement "if he presents circumstantial evidence that creates a triable issue concerning the

employer's discriminatory intent." *Id.* A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker. *Id.*

### A. Plaintiff's prima facie case of discrimination

Plaintiff's prima facie case fails because he cannot identify a similarly situated comparator who was treated more favorably than he was treated. Employees identified by a Title VII plaintiff as comparators must be similarly situated in all relevant respects. *Wilson*, 376 F.3d at 1091. Under Eleventh Circuit precedent, "the comparator must be nearly identical to the plaintiff." *Id.* "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia*, 171 F.3d at 1368 (quotations omitted). Thus, the Eleventh Circuit requires that the "quantify and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.* Material differences in ranks and responsibilities are relevant for considering whether an employee of the defendant is a proper comparator. *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008).

Examined in a light most favorable to the Plaintiff, the evidence in the record reveals no suitable comparator. Plaintiff points to Daniel Nash as a suitable comparator. (Hester Dep. at 63). This comparison fails for numerous reasons. First, Nash is not a PCT. Rather, he is the assistant nurse manager for JNT5 and Plaintiff's direct supervisor. Hester admitted in his deposition that PCTs and nurses have different job duties. (Hester Dep. at 86). Material differences in ranks and responsibilities undermine the comparator analysis, and the substantial difference in responsibilities in this case weighs heavily against Nash's eligibility as a comparator. *See Rioux*, 520 F.3d at 1280 (11th Cir. 2008).

Second, there is no evidence that Nash was accused of similar conduct but disciplined differently. Plaintiff testified that Nash put a female patient in a choke hold and was not disciplined. (Hester Dep. at 62-65). Nash denies this incident occurred, (Nash Dep. at 37), and there is no document evidence in the record to support Plaintiff's allegation. In fact, Hand, Nasiatka, Mayer, and Erwin denied ever receiving any report that Nash put a female patient in a choke hold. (Hand Dep. at 88-89; Nasiatka Dep. at 36; Mayer Dep. at 29; Erwin Decl. ¶¶ 13-14).

Plaintiff's vague, self-serving contention that Nash was once involved in a chokehold incident with a female patient does not provide the information necessary to determine whether Nash was similarly situated yet treated differently. Indeed, there is a complete failure to attempt to demonstrate "nearly identical"

quantity and quality of the alleged misconduct. There is no evidence as to where or when the alleged event occurred, the identity of the alleged patient, if there were other witnesses to the alleged event, or if it was ever reported to anyone. Instead, Hester merely "guesses" that the event was reported to Hand, Nash's superior. (*Id.* at 63-65). But there is no evidence before the court that any such incident was ever reported. As such, even if some sort of incident occurred between Nash and a patient, Plaintiff's assertions fail to establish that Nash's alleged contact was similar or identical to the degree of his own behavior. *See Floyd v. Fed. Exp. Corp.*, 423 F. App'x 924, 930 (11th Cir. 2011) (holding that two employees involved in a fight were not similarly situated when one attempted a punch and the other put his finger in the other's face). On the evidence before the court, Nash is not a suitable comparator as a matter of law.

Because Plaintiff failed to establish a similarly situated comparator who was treated more favorably than he was treated, he did not establish a prima facie case. That being said, "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562 (citing *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 182 (1st Cir. 1989) (emphasis added)). The court, therefore, turns to Plaintiff's evidence of discrimination and pretext argument.

### B. Legitimate, nondiscriminatory reasons and pretext

Defendant has carried its "exceedingly light" burden of articulating legitimate, nondiscriminatory reasons for Hester's termination. As discussed above, Hester was terminated because, after a joint review of the video footage and Hester's written statement, Nasiatka, Mayer and Erwin concluded that he violated UAB policies, specifically in that he failed to adhere to his CPI training and made dishonest statements inconsistent with the video evidence. (Nasiatka Dep at 23; Erwin Decl. ¶ 24). According to UAB policy, these actions are expressly subject to immediate termination rather than progressive discipline.

Because Defendant satisfied its burden of production of a legitimate, nondiscriminatory reason for Plaintiff's termination, Plaintiff must come forward with evidence sufficient to permit a reasonable fact finder to conclude the reasons Defendant gave were pretextual. *Burdine*, 450 U.S. at 253. Plaintiff may do so by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proferred legitimate reasons for its actions a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1348-50 (11th Cir. 2007). It is important to note that conclusory allegations of discrimination, without more, are insufficient to show pretext. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996). "A reason is not pretext for discrimination unless it is

shown both that the reason was false, and that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1162 (11th Cir. 2006.)

To show pretext, a plaintiff may not merely quarrel with the wisdom of the employer's reason, but must instead meet the reason head on and rebut it. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). The inquiry into pretext is based on "the employer's beliefs and not the employee's own perceptions of his performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). The question is not whether the employee actually had performance problems but "whether [his] employers were dissatisfied with [him] for these or other non-discriminatory reasons, even if mistakenly or unfairly so …" *Alavarez*, 610 F.3d at 1266.

Plaintiff offers three arguments for why pretext exists in this case. First, he contends that witnesses provided inconsistent statements regarding his actions. Specifically, he asserts that the witnesses who provided statements at the time of the incident changed their statements as a result of viewing the video. (Doc. 33 at 10-12). Next, Hester asserts that UAB failed to follow its own discipline policy in his case. (*Id*. at 13-14). Finally, Hester contends that "[t]ermination based on one second video review requires a trial" and cites to statements made by Nasiatka in a

completely unrelated case to suggest that his action in this case was based on discriminatory intent. (*Id*. at 15-17). The court addresses each argument in turn.

Plaintiff's first argument centers on the statements of two witnesses to the incident at issue. Michael Hodge, a PCT, and Elizabeth Larsen, a Registered Nurse, both wrote statements shortly after the incident. (Doc. 28-11 ("Hodge Decl.") ¶¶ 6, 9; Doc. 28-12 ("Larsen Decl.") ¶¶ 6, 9). Both of these statements more closely follow the statement written by Hester, including that the patient was the aggressor. (Hodge Decl. ¶ 12; Larsen Decl. ¶¶ 13-14). However, after the litigation began, both Hodge and Larson viewed the video footage of the incident and changed their statements to reflect that "[i]t was not until Hester began to lunge out of his chair at C.L. that C.L. attempted to swing and hit Mr. Hester with his hand." (Hodge Decl. ¶ 18; Larsen Decl. ¶ 22).

Plaintiff asserts that these "inconsistent *post hoc* witness statements [are] probative of pretext." (Doc. 33 at 11). Plaintiff does not cite any law in support of this statement and the court does not know of any. Instead, Plaintiff cited cases where the Eleventh Circuit found shifting explanations by the decisionmaker were evidence of pretext. *See Bechtel Const. Co. v. Secretary of Labor*, 50 F.3d 926, 935 (11th Cir. 1995); *see also Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 526-27 (11th Cir. 1994) (holding that inconsistent reasons for termination given by the defendant is evidence for pretext). These statements, which were prepared after

they had an opportunity to review the video, are a consequence of being more fully informed concerning the occurrence. They do not evidence pretext. Moreover, there is absolutely no evidence that Larsen and Hodge's initial statements were considered in the decision to terminate Hester.

Hester's next pretext argument centers on a criticism of Defendant's discipline process. (Doc. 33 at 13-14). Hester essentially argues that he should have been subjected to a lighter punishment given his history of adhering to UAB policies and the availability of progressive discipline policies. (*Id.*). This argument is unpersuasive. While failure to follow a progressive discipline policy and immediately moving to termination may help the terminated employee establish pretext and while flexibility in established procedures invites "increased scrutiny," *see Morrison v. Booth*, 763 F.2d 1366, 1373-74 (11th Cir. 1985), Plaintiff has not shown that UAB departed from its normal procedures.

UAB utilizes a progressive discipline policy that is in operation for most on-the-job offenses. However, the UAB policy recognizes the right of decisionmakers to terminate without warning and without strict adherence to the progressive discipline steps for certain policy violations. Among those violations justifying immediate discharge without notice are "incompetence . . . in patient care" and "inexcusable . . . dishonesty." (Doc. 28-8 at 2). Mayer testified Hester violated both of these prohibitions during the altercation with C.L. (Mayer Dep. at 12-13).

As such, under the UAB policy, these violations resulted in Plaintiff's immediate discharge. There is simply no evidence that UAB failed to follow its own policy in the decision to terminate Hester.[7]

What Plaintiff's argument is really doing is requesting the court to substitute its own business judgment for that of the defendant regarding reasonableness of immediate termination in place of progressive discipline. However, the court has no such authority. The Eleventh Circuit does not allow a plaintiff to simply recast the defendant's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. So long as the proffered reason is one that might motivate a reasonable employer to take the action in question, the plaintiff must meet that reason head on and rebut it. The plaintiff cannot simply declare that the reason is unwise or inaccurate. *Chapman v AI Transit*, 229 F.3d 1012, 1030 (11th Cir. 2000).

Finally, the court rejects Hester's last pretext argument. Hester argues that termination based on the video requires a trial and cites to statements made by Nasiatka in a completely unrelated case to suggest that his action in this case was based on discriminatory intent. (Doc. 33 at 15-17). Plaintiff cites to and extensively quotes from another case where a different judge denied summary

---

[7] Additionally, there is no evidence that UAB inconsistently treated employees engaging in physical altercations and violating CPI policy. In fact, the record provides multiple examples of employees who were terminated for the same reasons Hester was terminated. (Nasiatka Dep. at 19; Erwin Dep. at 26-30).

judgment where Nasiatka was a witness and reviewed video of another employee in the CPM. (*Id*.). The full facts, evidence, and legal arguments in that case are not before the court here. As such, the decisions made therein do not establish pretext and have no bearing on whether Plaintiff was terminated because of his race.[8]

Additionally, Plaintiff references a statement allegedly made by Nasiatka in yet another case.[9] (Doc. 33 at 16-17). The reference amounts to nothing more than an unabashed attempt to taint Nasiatka's character. The alleged statement has nothing to do with discrimination in this case and certainly is not probative as to the issue of pretext.

Although not specifically enumerated by Hester as a pretext argument, he contends throughout his brief that he followed all policies and procedures the day of the incident with the patient. (Doc. 33 at 5). For purposes of Rule 56, however, the court is not concerned with whether Hester actually committed the policy violation but whether the decisionmakers honestly believed Hester engaged in the

---

[8] However, even if that evidence was properly before this court, it is factually distinguishable. In that case, United States District Judge Abdul Kallon found that the video evidence "before the court skips over key portions of the footage from the camera" concerning the relevant incident. (Doc. 33 at 16) (quoting *Freeman v. Bd. Of Trustees of the Univ. of Alabama*, No. 2:13-cv-0816-AKK, 2015 WL 3604197, *6 (N.D. Ala. Jun. 8, 2015)). There is no such allegation, much less, evidence of the same in this case.

[9] The evidence is that in November 2009, Nasiatka yelled at LPN Elaine Harris in the presence of other personnel. Specifically, he told her to "stay out management's business." *Harris v. UAB Health Sys.*, No. 2:11-cv-02446-VEH, 2013 WL 2338446, *3 (N.D. Ala. May 23, 2013).

misconduct. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999). The concern is "whether unlawful discriminatory animus motivated" the decision to terminate. *Alvarez*, 610 F.3d at 1266.

Plaintiff failed to present any evidence that suggests Mayer, Erwin, and Nasiatka did not believe that Hester improperly violated the CPI training and UAB policy and then made a dishonest statement about the event. Plaintiff is free to argue about whether their belief was correct or their decision was well-founded, but such an argument does not work to satisfy the plaintiff's burden. *See Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). The pretext inquiry "centers on the employers' beliefs…" rather than on "reality as it exists outside of the decision-maker's head." *Alvarez*, 610 F.3d at 1266.

For these reasons, Plaintiff failed to establish that the reasons stated for his termination were a mere pretext for race discrimination. Additionally, he has not presented a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker. As a result, Defendant is entitled to summary judgement on Plaintiff's disparate treatment claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant The University of Alabama Board of Trustees is entitled to judgment as a matter of law on the claim asserted in

Plaintiff's complaint.  As such, Defendant's motion for summary judgment (Doc.

26) is due to be granted.  A separate order will be entered.

**DATED** this 30th day of November, 2018.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge